**Case No. 23-5007**

In the United States Court of Appeals for the Tenth Circuit

**United States of America,**
Appellee-Plaintiff,

v.

**Thomas Anthony Pearce, II,**
Appellant-Defendant.

On Appeal from the United States District Court
For the Northern District of Oklahoma
The Honorable Claire V. Eagan
D.C. No. 21-CR-00237-CVE

**Appellant Thomas Anthony Pearce's Reply Brief**

Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave. NE Suite C2
Albuquerque, NM 87113
505.639.5709
ryan@rjvlawfirm.com

Oral argument is requested.

November 13, 2023

## Table of Contents

|  | Page |
|---|---|
| Table of Contents | i |
| Reply Argument | 1 |
| Conclusion | 12 |
| Certificate of Compliance with Type-Volume Limit | 13 |
| Typeface Requirements, and Type Style Requirements | 13 |
| Certificate of Service | 13 |

# Table of Authorities

Cases                                                                                                                          Page

*Alabama v. White*, 496 U.S. 325, 330 (1990) ........................................................3

*Illinois v. Wardlow*, 528 U.S. 119, 121-22 (2000)...............................................9, 12

*Ohio v. Robinette*, 519 U.S. 33, 39 (1996)..............................................................3

*Olivares-Rangel*, 458 F.3d 1104, 1109 (10th Cir. 2006)........................................12

*See United States v. Clarkson*, 551 F.3d 1196, 1200–01 (10th Cir. 2009)................3

*United States v. Davis*, 94 F.3d 1465 (10th Cir. 1996).......................................9, 10

*United States v. Fernandez*, 18 F.3d 880 (10th Cir. 2016)..................................5, 11

*United States v. Hernandez*, 847 F.3d 1257 (10th Cir. 2016) ........................ 5, 6, 12

*United States v. King*, 209 Fed. Appx. 760, 761 (10th Cir. 2006) ...........................8

*United States v. Ludwig*, 641 F.3d 1243 (10th Cir. 2011) .....................................7, 9

*United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020) ..............................11

*United States v. McGehee*, 672 F.3d 860 (10th Cir. 2012).......................................5

*United States v. Sokolow*, 490 U.S. 1 (1989)............................................................5

*United States v. Winder*, 557 F.3d 1129, 1132 (10th Cir. 2009) ..............................8

*United States v. Wood*, 106 F.3d 942 (10th Cir. 1997).............................................8

*United States v. Wood*, 915 F. Supp. 1126, 1138 (D. Kan. 1996) ............................8

## Reply Argument

Mr. Pearce, in his Opening Brief, argued that the district court erred when it denied his motion to suppress on the grounds that Corporal Golliday had reasonable suspicion to execute the traffic stop of his truck. In its Answer Brief, rather than addressing Mr. Pearce's arguments on the merits, much of the government's response is spent detailing the facts of the case that are not at all relevant to the issue raised on appeal. *See generally* Answer Br. at 1-3 (detailing graphic history of the case unrelated to Corporal Golliday's stop); 7 (discussing what was found well after the stop was executed); 9 (listing testimony of an unrelated witness). While the Court is more than capable of parsing relevant and irrelevant facts, the government's recitation of these irrelevant facts serves no purpose other than to confuse the issues and invoke the pathos of the Court to reach a result unsupported by law. *See id.* at 3 (referring to threats of kidnapping and rape without indicating how that supports Golliday's reasonable suspicion to execute a stop).

The Court should not consider irrelevant facts that are highlighted by the government in an attempt to illicit an emotional response. Rather, to promote judicial efficiency and to safeguard the right to a fair appeal on the legal merits of the issue raised by Mr. Pearce, the Court should only consider the facts that existed at the time of the stop. The inflammatory information provided in the Answer Brief that was

learned after the stop does not support the government's claim that the stop was valid under the Fourth Amendment in anyway.

By citing these facts, the United States is implicitly suggesting to the Court that the nature and circumstances of the crime itself, all discovered after the stop, is relevant to this Court's decision whether the stop was supported by reasonable suspicion. Notably, the government cites no law to support this implication. The government's arguments that are germane to the stop are that it was lawful because there was sufficient reasonable suspicion for two primary reasons: the circumstances that existed when Corporal Golliday noticed the truck parked, *see id*. at 13, and Mr. Pearce's "flight from police." *See id* at 17. These arguments lack support in the law based on the record before this Court. Corporal Golliday's observation that the truck was legally parked at a residential construction site at night and drove away after he passed by at what he claimed was high speed, is insufficient to justify the traffic stop under the Fourth Amendment.

**I.     Under the totality of the circumstances, the district court erred when it denied Mr. Pearce's motion to suppress based on the evidence presented about what was known to Corporal Golliday at the time of the stop.**

The United States argues that the totality of the circumstances present at the time of the stop supported the district court's conclusion that the stop was valid under the Fourth Amendment. *See generally id.* at 13, 17. To be sure, the district court was required to examine the totality of the circumstances when determining whether

reasonable suspicion existed at the time of the stop. *See Alabama v. White*, 496 U.S. 325, 330 (1990); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) ("Reasonableness … is measured in objective terms by examining the totality of the circumstances"). Setting aside the government's recitation of facts discovered after the stop, the parties here dispute whether the district court's legal conclusion that those circumstances amounted to reasonable suspicion was proper. This Court must review *de novo* whether these circumstances establish a Fourth Amendment violation. *See United States v. Clarkson*, 551 F.3d 1196, 1200–01 (10th Cir. 2009).

In his Opening Brief, Mr. Pearce acknowledged that the district court relied upon the totality of the circumstances to reach its conclusion that "'Golliday had reasonable suspicion to initiate an investigative detention of defendant's vehicle based on the time of day, the unusual location of the vehicle, reports of crime in the area, and the obviously suspicious behavior of driving away from Golliday at a high rate of speed.'" Opening Br. at 8-9, quoting ROA, Supp. Vol. I at 64. The government makes no contention that Mr. Pearce was not seized at the time officer Golliday initiated the stop. Therefore, the only issue is whether there was reasonable suspicion to initiate the stop. The government lists the following to support its claim that reasonable suspicion existed: (1) the location where the truck was parked, (2) the fact it was 2:00 am; (3) the rural construction site on the edge of Jenks, Oklahoma that was a "common target for burglaries;" (4) Officer Golliday's testimony that

3

construction site theft is common and Jenks had received reports of theft from the area; and (5) that Mr. Pearce drove away from the patrol car at "great speeds." *see* Answer Br. 13-14. As discussed in the Opening Brief, and below, these facts did not create reasonable suspicion to stop Mr. Pearce.

### A. Where Mr. Pearce was parked, the time of day, and that the area is a common target for theft or burglaries do not sufficiently contribute to objective reasonable suspicion.

The district court found that "Golliday had reasonable suspicion to believe that some *other type of criminal activity* could be ongoing." ROA, Supp. Vol. I, at 64-65 (emphasis added). It is unclear from either the government's Answer Brief, the testimony of Corporal Golliday, or the district court's reasoning below exactly what criminal activity Mr. Pearce was involved in that would support reasonable suspicion. The government's brief did not articulate what that criminal activity might have been. Instead, it appears that the Corporal was relying on speculation. Corporal Golliday testified he thought there could be a number of crimes being committed such as drinking and driving, or something to do with the construction site like theft, vehicle burglary, or trespassing. *See* ROA Vol. II 19: 24-25; 20: 1-3, 21-22; 21: 2-4. However, there was no basis for a *particularized* belief based just on the facts Corporal Golliday knew at the time.

On the one hand, the government notes that Corporal Golliday saw someone moving in the driver's seat and thought perhaps someone needed help or the driver

4

could be drunk, and the Corporal wanted to check to see if the driver was alright. *See* Answer Brief at 5. While on the other hand, the government admits the officer's subjective beliefs are not relevant, as the standard is an objective one. *See id.* at 20 (quoting *United States v. McGehee*, 672 F.3d 860, 867 (10th Cir. 2012)). Here, Corporal Golliday's hunches, whichever of the many is examined, were all objectively unparticularized inchoate suspicions by definition. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Corporal Golliday's guess and conjecture as to three possible crimes that might be occurring, or the driver of the truck potentially being in need of aid, all based on the where the truck was parked and the time of night, is exactly the unparticularized hunch and "belief that *something* is afoot" which the Fourth Amendment prohibits as a basis for a stop. *See United States v. Fernandez*, 18 F.3d 880 (10th Cir. 2016).

This case is on par with case law in which this Court has found unconstitutional stops. The government's attempts to distance the instant case from those cases fail. Most notably, the government attempts to distinguish *United States v. Hernandez*, 847 F.3d 1257 (10th Cir. 2016) because the encounter there happened at a different time of night. *See* Answer Br. at 22. The government also points out that the *Hernandez* defendant was next to a construction site rather than "on" one because Hernandez was not inside the fence. *Id.* This distinction is without a difference. There is nothing in the record to indicate Mr. Pearce was on the other

side of a fence, had passed any barriers at all, or was otherwise near valuables that a property owner sought to protect. Mr. Pearce was backed in on a slab of concrete on the edge of 131st Street just west of Lewis. *See* ROA Vol. II, 167: 10-11. The slab of concrete was "the *beginnings* of a driveway [for] a house that [was not] built yet." *Id.* at 167: 10-11. In other words, he was on a piece of concrete next to an empty lot that was not under construction, right next to the road, next to another lot with an incomplete home. This is a far cry from the inside of a fence or inside a designated workspace. Similarly, the defendant in *Hernandez* was next to the construction site instead of using the nearby sidewalk. 847 F.3d at 1268.

    The government's attempt to distinguish *Hernandez* on the fact that it was a different time of night, also fails. Here, as in *Hernandez*, both individuals were thought to be alone, *see id.* at 1267 ("Mr. Hernandez was alone"), and neither area was lit by streetlights. *See id* at 1260 ("It was dark out and the intersection was unlit"). The distinction is without a cognizable difference, and therefore, *Hernandez* is otherwise applicable as it considers multiple factors, such as a high crime construction area at night that had been the target of thefts, and those, even taken together, did not lead to reasonable suspicion. *See id.* at 1268, 1270. No different than *Hernandez*, this stop is based on "'inchoate suspicions and unparticularized hunches.'" *Id.* at 1270. Accordingly, this Court should conclude that the district court erred when making the determination that the stop was lawful.

**B. Corporal Golliday's "observation" of speeding while he was behind the vehicle attempting to catch up in an area without streetlights does not create, or adequately contribute to reasonable suspicion.**

In its Answer Brief, the United States asserts that Mr. Pearce claims that the sole reason for Golliday's stop was speeding. *See* Answer Br. at 19; 21 ("Pearce's contention that the stop was based solely on speeding"). That is not what Mr. Pierce asserts. Corporal Golliday's stop was not based on speeding, it was based on an impermissible hunch. *See* Opening Br. at 9. The Opening Brief discusses that the *report* from the incident relies on nothing more than speeding when justifying the stop, which is true. *See id.* at 21 (citing ROA, Supp. Vol. I, at 26). Mr. Pearce acknowledges that Corporal Golliday added to that factual scenario when he testified to and expounded on the facts he used to determine reasonable suspicion. Regardless, any contention that speeding is either enough to establish reasonable suspicion or a sufficient contributor to reasonable suspicion is unfounded based on this record.

The government makes repeated attempts to establish that the record is rife with information about speeding. *See generally* Answer Br. at 6, 9, 17, 23. However, it is clear that Golliday never made a sufficient observation regarding the truck "speeding away" such as what occurred in *United States v. Ludwig*, 641 F.3d 1243 (10th Cir. 2011). A visual estimate of speed, such as the one in this case, is only acceptable in appropriate circumstances. *See Ludwig* 641 F.3d, at 1247 (noting that

7

the officer in *Ludwig* had a "fine view" to watch the car approach from a stationary position on a "crystal clear" day). What Golliday observed here does not equate to the circumstances in *Ludwig* or those in other cases. *See United States v. King*, 209 Fed. Appx. 760, 761 (10th Cir. 2006) (discussing the use of radar gun to measure speed); *United States v. Winder*, 557 F.3d 1129, 1132 (10th Cir. 2009) (same); *United States v. Wood*, 915 F. Supp. 1126, 1138 (D. Kan. 1996) (noting a stopwatch and speed matching were used to determine speed), *rev'd on other grounds United States v. Wood*, 106 F.3d 942 (10th Cir. 1997)).

To be clear, Corporal Golliday did not observe the vehicle leave the driveway because he went down the hill to turn around. ROA, Vol. II 19: 17-18. After driving past Mr. Pierce's truck, Corporal Golliday had to do a U-turn at the next intersection down the hill and return to the driveway where Mr. Pearce was parked. *Id.* at 15:17-18; 20:21-22; 171:7-9. It was not until he came back up the hill that he observed the vehicle leaving at what he claimed was "a high rate of speed." *Id*. at 21: 22-23. Officer Golliday characterized the rate of speed as "excessive acceleration" and "traveling over the speed limit." *Id*. at 22: 15-17. He did not use a radar to measure the truck's speed. *Id*. at 22: 18-19. Instead, it was based solely on "training and experience." *Id*. at 22: 18-19.

Moreover, Corporal Golliday had to observe the alleged speeding while accelerating to catch up to Mr. Pearce, who had left the driveway prior to the

8

Corporal's return. ROA, Vol. II, at 41:3-8; 42:7-8; 171:19-20. All while doing so at night while there were no streetlights nearby. Observing speed on an unlit road based solely on the lights of a moving vehicle, while the observer is simultaneously moving is not similar to the "fine view" that existed in *Ludwig*. 641 F.3d at 1247. It is clearly erroneous to conclude otherwise.

Given this, the government's argument that Mr. Pearce's conduct amounted to "headlong" flight, is misplaced. Answer Br. At 19. Mr. Pearce leaving the driveway after Corporal Golliday drove away, ROA, Vol. II, at 42:7-8, is clearly distinguished from behavior that amounts to flight that may lead to reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 121-22 (2000) (discussing fleeing an *approaching* officer). Mr. Pearce's actions were not "headlong" flight from *approaching* officers. *See id.* at 124-25. "[W]hen an officer…approaches an individual, [he] has a right to ignore the police and go about his business." *Id*. at 126. For an individual to engage in unprovoked, headlong flight, he must flee an *approaching* officer. *See id.*

The conduct here is more akin to what occurred in *United States v. Davis*, 94 F.3d 1465 (10th Cir. 1996). The defendant in *Davis* exited his car, made and then broke eye contact with officers, and then walked away. This did not furnish the basis for a valid *Terry* stop. *Id.* at 1468. "Absent a *specific* and articulable factual basis, an officer's perception is nothing more than an inchoate and unparticularized

9

suspicion or hunch." *Id.* at 1469 (emphasis added) (internal quotations omitted). The *Davis* court also disagreed with the district court that an evasive attitude in the context of a high crime area gave rise to reasonable suspicion and was instead a hunch. *See id.*

To be sure, no such headlong flight occurred here. Like in *Davis*, Mr. Pearce chose to leave and go about his business after Golliday drove on. Golliday did not see this as he turned around far enough away from the truck that he lost sight of it. This is evidenced by the fact the light illuminating from the intersection at which Golliday turned around did not reach the concrete pad where Mr. Pearce was parked that was explained to be in the dark and unlit. ROA, Vol. II at 168: 24-25; 169: 1-2. Essentially, Golliday had left the scene and lost sight of the truck. He chose to casually drive down the street before turning around to approach Mr. Pearce. There was not any haste to speak with Mr. Pearce. Thus, there is no objective evidence that Mr. Pearce sped away other than Golliday's speculation that he left quickly. Regardless, as demonstrated by *Davis*, there is a difference between avoiding contact with police, which is the right of every person, and actively fleeing from a police encounter. Golliday was headed in the opposite direction when Mr. Pearce left the driveway. Mr. Pearce did not flee when Golliday was approaching. Accordingly, Mr. Pearce's actions in going in the opposite direction of Golliday after he passed cannot give rise to or support reasonable suspicion.

### C. The totality of the circumstances does not rise to reasonable suspicion.

At the moment Corporal Golliday pulled Mr. Pearce over, he affected a seizure requiring reasonable suspicion. *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020). The government does not contend otherwise. The record makes clear this was based on a hunch. A "sixth sense," a "detection of tension in the air," and a "belief that something was afoot" is insufficient for reasonable suspicion and instead indicate that Corporal Golliday was acting on an unparticularized hunch. *Fernandez*, 18 F.3d at 880. The district court and the government have relied upon the totality of the foregoing circumstances to support the conclusion that "Golliday had reasonable suspicion to initiate an investigative detention of defendant's vehicle based on the time of day, the unusual location of the vehicle, reports of crime in the area, and the obviously suspicious behavior of driving away from Golliday at a high rate of speed." ROA, Supp. Vol. I at 64. As a matter of law, this is insufficient.

The government's Answer Brief argues that each factually analogous case Mr. Pearce presented is distinguishable due to what boils down to, semantics. Notably, the government fails to present any alternative case to this Court with similar facts where reasonable suspicion was found. Each of the cases presented in Mr. Pearce's Opening Brief, when read together, directly address the issue raised in this appeal and support reversal.

In sum, even when taken together, Corporal Golliday's observations are not objectively sufficient to establish reasonable suspicion. *See Hernandez*, 847 F.3d at 1268 (discussing high crime construction site at night); *Wardlow*, 528 U.S. at 121-22 (discussing fleeing an *approaching* officer). Any evidence recovered from the unlawful stop is fruit of the poisonous tree and should have been suppressed due to the lack of reasonable suspicion. *Olivares-Rangel*, 458 F.3d 1104, 1109 (10th Cir. 2006). The district court having ruled otherwise, this Court should reverse. *Hernandez*, 847 F.3d at 1270.

## Conclusion

For the foregoing reasons and those set forth in Mr. Pearce's Opening Brief, this Court should vacate Mr. Pearce's convictions and remand this case to the trial court for further proceedings.

Respectfully submitted,

*/s/ Ryan J. Villa*
Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave. NE Suite C2
Albuquerque, NM 87113
Phone (505) 639-5709
ryan@rjvlawfirm.com

## Certificate of Compliance with Type-Volume Limit
## Typeface Requirements, and Type Style Requirements

1. This document complies with the word limit of Fed. R. App. P. 5(c)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 2998 words.

2. This document complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this document has been prepared using Microsoft Word in 14 point Times New Roman font.

Date: November 13, 2023

*/s/ Ryan J. Villa*
Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave. NE Suite C2
Albuquerque, NM 87113
Phone (505) 639-5709
ryan@rjvlawfirm.com

## Certificate of Service

I certify that on November 13, 2023, I electronically filed the foregoing using the CM/ECF system, which will send notification of this filing to all parties entitled to notice.

*/s/ Ryan J. Villa*
Ryan J. Villa
The Law Office of Ryan J. Villa
5501 Eagle Rock Ave. NE Suite C2
Albuquerque, NM 87113
Phone (505) 639-5709
ryan@rjvlawfirm.com